633 So.2d 457 (1993)
The TRAVELERS INSURANCE COMPANY, et al., Appellants,
v.
D.J. WELLS, Jr. and Vesta Wells d/b/a Mill Creek Sawmill Building Materials, et al., Appellees.
Nos. 92-2958, 92-2959.
District Court of Appeal of Florida, Fifth District.
November 19, 1993.
Opinion Clarifying Decision March 18, 1994.
*458 John R. Bello, Jr. and Eliott R. Good of Chorpenning, Good, Gibbons & Cohn, Tampa, for appellant.
Donald L. O'Dell and David W. Henry of McDonough, O'Neal & O'Dell, Orlando, for appellant George Mangan Ins., Inc.
Lewis E. Dinkins of Lewis E. Dinkins, P.A., Ocala, for appellees.
W. SHARP, Judge.
The Travelers Insurance Company and George Mangan Insurance, Inc. appeal from judgments rendered against them in favor of D.J. Wells, Jr. and Vesta Wells, doing business as Mill Creek Sawmill Building Materials, a Florida partnership. The jury specifically found that Travelers and Mangan (an insurance agency) had breached their respective contracts with Mill Creek to provide a policy for worker's compensation insurance for the year 1987 and that Mill Creek could *459 not have avoided the ensuing damage (loss of net profits for 1987) caused by the breach by exercising reasonable effort and care. It awarded Mill Creek $75,000 against Travelers and $50,000 against Mangan. The appellants argue the damage awards are not supported by competent and substantial evidence. We agree in part, and remand for a new trial on the damage issue or for the entry of an order of remittitur.
Viewing the evidence presented at trial in a light most favorable to the appellee, which as an appellate court we must do,[1] Mill Creek established it was a moderately successful, family-originated and run sawmill business in Marion County, Florida. Vesta Wells and her husband, D.J. Wells, Sr. started the mill sometime after they married in 1941. In the past ten years, Vesta's and D.J.'s son, D.J. Wells, Jr., and his wife, Paula, ran the business. Paula took care of the bookkeeping and paper work. D.J., Jr. handled the yard and mill operations.
It was a small business, with a well-established reputation in the industry for fair dealing and good prices. Mill Creek was able to compete in the highly competitive lumber business by specializing in cutting cypress logs, and special orders not handled economically by the larger lumber mills. It also sold small amounts of hardware on a retail basis. In 1984, Mill Creek added the retail sales of other building supplies and hardware.
In 1985, Paula contacted Mangan to obtain coverage for workers' compensation insurance for the mill when their insurance carrier ceased to write policies for sawmills. She dealt with Mrs. Gaffney, Mangan's employee, who had extensive years of experience in the insurance business. Gaffney obtained coverage for Mill Creek by applying to the "assigned risk pool."[2] Travelers was the assigned carrier.
For workers' compensation policies, the premium is based on payroll. It is estimated for the year and an advance deposit is required prior to issuing the policy. Later in the year, audits are made, and based on findings regarding payroll, additional premiums may be charged.
Unfortunately, the Mill Creek account was not handled appropriately. Evidence was adduced that Mill Creek paid the initial premium for 1985. The semiannual audit showed an additional premium due of $2,011 and the final audit showed an additional premium due of $2,140 for a total of $4,151. Mangan received a copy of a billing for 1985 showing there was a balance due. Mill Creek did not receive one, and did not pay the additional sum owed for 1985. Nevertheless, Travelers sent Mill Creek a renewal notice for 1986, with an estimate and required deposit. Mill Creek paid the 1986 estimated amount, and was issued a policy for 1986.
In October of 1986, Travelers generated an additional billing of $2,212 for 1986. Mill Creek did not receive this billing. A copy of this notice was sent to Mangan. Mangan did not copy Mill Creek with the billing notice, nor inquire whether it was paid.
As the 1986 policy year drew to a close, Travelers sent Mill Creek a cancellation notice issued November 19, 1986, asserting it was owed past due premiums and if they were not paid by December 20, it would cancel the policy. No copy of this notice was sent to Mangan's. Paula also had received a renewal notice from Travelers dated October 9, 1986. It notified her she should pay a $3,857 deposit by January 1, 1987, in order to continue coverage.
Paula called Gaffney because she was confused by the two notices. She told Gaffney the cancelation notice did not look right to her. Gaffney did not check her file to see whether or not Mangan had received copies of past due premium notices for the 1985 and 1986 coverage years. She assumed Paula was calling about the "same old renewal notice" which every one receives each year. She had a copy of the 1987 renewal notice in her file.
*460 Mrs. Gaffney testified insurance companies would not send renewal notices if there were unpaid premium billings. Thus, she simply advised Paula to pay the renewal amount requested. Paula sent a check payable to Mangan for that amount, with a notation it was to pay for the 1987 policy.
Mangan deposited the check in its own account, and issued a check payable to Travelers for the same amount. However, without any verbal or written permission from Mill Creek, and contrary to Mill Creek's direction that the payment be applied to the 1987 policy, Mangan directed payment be applied to the 1986 billing. How that came about, no one was able to explain.
When the check from Mangan was received by Travelers there was evidently some dispute (in-house) about whether it should be applied to the 1987 renewal policy. Notations on the check stated it should not be applied to the back premium charges. Clearly it was in the exact amount Travelers had billed for the 1987 renewal.
Travelers went both ways on this one. It applied the $3,857 to the 1985-86 back billings, and on January 8, 1987, it notified Gaffney that the policy had been cancelled. Later it paid Mangan's a commission or "fee" for the 1987 policy. When Gaffney later questioned Travelers about how to handle the commission on the 1987 unissued policy, she was told to "put it in the bank, the thing would straighten itself out."
Mrs. Gaffney immediately called Paula and told her they were operating the mill without the required insurance. All parties were well aware that in Florida, the mill could not be operated with non-family employees without workers' compensation insurance. Paula and D.J., Jr. sent their nine outside employees home, and shut down most of the mill operations.
Paula and D.J., Jr. called Travelers to try to get their insurance coverage reinstated. They explained they had no notice they owed back charges for 1985 and 1986. They offered to pay the charges in full, over six months time, if the 1987 policy were issued, and they could operate the mill. They explained they could not immediately pay the back charges, plus the 1987 premium.
Travelers took a hard line. It told them they owed some $6,000 additional monies. However, even if Mill Creek paid that amount instantly, Travelers would not under any circumstances, issue a new policy for Mill Creek. The agent for Travelers told Paula and D.J., Jr. that without insurance, they must shut down and that as long as Travelers was owed money by Mill Creek, it could not be assigned another carrier from the "assigned risk pool."
Paula and D.J., Jr. called a lengthy list of other insurance agents and companies to try to get coverage from another carrier for 1987 with no success. They contacted the State Insurance Commissioner's Office for help. Someone made a preliminary investigation, but declined to intervene on their behalf. As the person explained to Paula, the people in that office work with insurance companies all the time and they had to "get along" with them.
At that point, Paula and D.J., Jr. concluded they had no alternative but to permanently close Mill Creek. During 1987, they operated the mill and lumber yard on a minimal basis, with only their own personal or other family member's labor. Without the income from the mill, D.J. Jr. testified they contemplated filing for bankruptcy. But, they continued in business on a much reduced basis, and were paying all of their bills, a small amount at a time, including Travelers'.
At trial, counsel for Mill Creek sought to prove Mill Creek's projected lost profits for 1987 as the damages proximately resulting from Travelers' and Mangan's breach of contract to issue and procure the 1987 insurance policy. D.J. Wells, Jr. testified the mill lost $200,000 during 1987 because of the forced closing of most of its mill operations. However, he admitted the $200,000 was a gross sales figure and that he did not handle the bookkeeping side of the business.
Paula testified she was the primary record keeper and bill payer for the business, although she had no special training in bookkeeping or accounting. She kept the books and records the way D.J. Jr.'s parents had *461 done, in the past, and furnished them, as well as all requested information, to their accountant, Mr. Furman, a C.P.A. His firm had done all of the accounting service for Mill Creek since 1978 and he had prepared Mill Creek's income tax returns for the last several years. Mill Creek's business records were brought into the courtroom at trial in boxes, but neither side proffered them in evidence.
Mr. Furman testified as to the net profit Mill Creek would have earned in 1987, if it had not been shut down due to lack of workers' compensation insurance. He prepared an economic "forecast" or projection, based on assumptions that 1987 would have continued on the same course as set by 1984, 1985 and 1986. He based his forecast on Mill Creek's income tax returns for 1984, 1985 and 1986. They were also available in court, although they were not placed in evidence.
One difficulty with his forecast was the fact that he had to separate out expenses and sales for the hardware side of the business as opposed to the mill and lumber yard. For this, he relied upon Paula and D.J., Jr. to tell him what expenses and sales related to which part of the business. However, the hardware business did not amount to much prior to 1986. He admitted he had to estimate some expenses.
Furman concluded that Mill Creek's net profit for 1987 would have been $86,748, had it been fully operating as in 1986. From that figure (counsel for Mill Creek agreed), it was necessary to subtract $14,444, the net amount the business actually earned in 1987, from its reduced mill operations. The lost net profit of the mill for its mill operations in 1987 was thus $72,304, based on Furman's testimony.
The jury verdict determined in this case that both Mangan and Travelers breached their contracts with Mill Creek to procure[3] and issue[4] (respectively) worker's compensation insurance for the year 1987, and that Mill Creek did all it could have done under the circumstances to avoid the resulting damages. We think there was sufficient competent evidence presented at trial to support the jury's fact findings on these two points We are, however, troubled by the lack of competent evidence in the record to support the jury's additional determination that Mangan's breach of contract caused Mill Creek $50,000 in damages and Travelers' caused Mill Creek $75,000 in damages, for a total of $125,000.
Appellants argue that damage for breach of an insurance contract is limited to paying the loss suffered by the should-have-been insured person, which would have been covered by the insurance policy, had it been issued. In this case, no worker was injured and went without coverage. So in that limited sense, Mill Creek suffered no direct damages caused by not having its 1987 policy renewed.
Although that is normally the measure of damages for breach of an insurance contract,[5] it is not exclusive. Consequential or resulting collateral damage may also be recovered if it can be sufficiently proved.[6] It is possible to recover damages sustained by the wronged (uninsured) party, not because of the occurrence of the contingency which should have been insured against, but because of the breached contract, such as lost profits. Glades Oil Co. v. R.A.I. Management, Inc., 510 So.2d 1193 (Fla. 4th DCA 1987). In cases such as this one, where a business is terminated, and operating expenses *462 cease, the net (not gross) anticipated profit is the correct measure of damages.[7]
First, however, there must be sufficient competent evidence in the record that the damages were reasonably foreseeable at the time the insurance contract was entered into and breached.[8] In this case, the evidence showed that Mangan and Travelers were well aware that Mill Creek could not operate without workers' compensation insurance, and that unless Travelers was paid all that it then demanded (in excess of $6,000),[9] Mill Creek could not obtain such necessary insurance from the assigned risk pool, where all parties knew Mill Creek had to go for coverage.
They also knew Mill Creek was a small operation, and could not immediately pay the demanded sums for back charges of 1985 and 1986 premiums, in addition to the 1987 premium. Travelers and Mangan both also knew (taking the evidence in a light most favorable to Mill Creek) that Mill Creek timely paid its monies for the 1987 policy renewal, and neither received any authorization to apply those funds in any other manner. Under these circumstances, the jury could have concluded the anticipated consequences of Mill Creek's not having its 1987 policy renewed was shutting down and loss of net profits for that year it should have been in operation.
The second requirement for a recovery based on loss of net profits is that the record affords a reasonable basis to conclude the business would have had a net profit had it been able to operate.[10] In most cases, there must be a history of past profits over a reasonable time period.[11] And, there must be proof with a reasonable degree of certainty, of the business' projected operating expenses, to arrive at a net profit figure as opposed to gross income.[12]
In this case, Mill Creek sought to prove only one source of damages: lost net profits for 1987. Its only competent witness on this issue was Furman. He testified he calculated Mill Creek's anticipated lost net profit for 1987 based on projections formulated from the three prior years of operations, which he based on Mill Creek's tax returns he had prepared. He was accepted as an expert witness and he testified that his methodology of projecting or forecasting future business operations based on past years of performance was an accepted tool in the accounting and financial fields in which he operated.
It appears to us that Furman's testimony was sufficiently grounded in methodology and fact to permit it to serve as a basis for the jury's verdict. Courts do not require exact certainty with regard to proof of lost anticipated net profit; only an approximation, and a reasonable basis for the computation.[13] Unlike the other witnesses for Mill *463 Creek, Furman also based his testimony on consideration of projected operating costs and expenses for 1987. They were based on the business' prior years of operation shown on the tax returns. He also excluded expenses and income from the retail business. Finally, he deducted the small amount of profit Mill Creek earned for 1987 for its reduced mill operations. His calculations were thus sufficient to prove lost net profits.[14]
The problem in this case is that the only competent evidence in the record established Mill Creek's estimated lost net profits for 1987 were in the range of $86,000. From that figure, Mill Creek's actual net profit for its reduced mill operation for 1987 (about $14,000) logically must be deducted, leaving Mill Creek's lost anticipated net profits in the range of $72,000. At best, the record fails to support the jury's verdicts of $50,000 against Mangan and an additional $75,000 against Travelers. Although two defendants were involved, which the jury found breached their contracts with Mill Creek, Mill Creek only proved one lost year of net anticipated profits resulting from both breaches of contract.
Under these circumstances, we cannot affirm the judgment as it stands.[15] Nor is this the type of case in which we can "correct" the judgment by a mathematical recalculation.[16] However, this appears to be an appropriate case for us to remand to the trial court for the purpose of entering an order of remittitur.[17] If the order of remittitur is accepted by the appellants, no further trial proceedings will be necessary. If not, then a new trial on damages alone shall be granted.[18]
Because two defendants are involved in this case, the order of remittitur should be crafted so as to allow Mill Creek to recover only a total of $72,304 against both jointly and severally, and a maximum of $50,000 against Mangan. Accordingly, we conditionally affirm the judgment appealed, and we remand this case to the trial court for entry of an order of remittitur. If either or both of the appellants disagree with the order of remittitur, we direct the trial court to grant a new trial on the damages issue only.
AFFIRMED in part, REMANDED in part, with direction to enter an order for remittitur or grant a new trial on damages.
HARRIS, C.J., and PETERSON, J., concur.

ON MOTION FOR CLARIFICATION
W. SHARP, Judge.
We grant The Travelers Insurance Company's motion for clarification of our opinion issued November 19, 1993 and the order of remittitur to be entered by the trial court.
On remand, the trial court should devise an order of remittitur which apportions the total damages supportable on the basis of this record ($72,304) between the two appellants. The sole limitation is that the maximum awardable against Managan is $50,000, because that was the amount found by the jury. We suggest the following formula for apportionment, which appears to us as applicable in this case:

 Managan = 50 x 72,304
 ___
 125
 Travelers = 75 x 72,304
 125

If both parties do not agree to the order of remittitur, then a new trial is necessary. The damage issue shall be revisited de novo with no limitation as to the amount, or theory of liability. Based on this *464 record, because both appellants independently by breach of contract and/or negligence caused the same and sole economic injury (lost profits of the business for one year) their liability should be joint and several. See University of Miami v. All-Pro Athletic Surfaces, Inc., 619 So.2d 1034 (Fla. 3d DCA 1993); Kahlert v. Tom Heller, Inc., 557 So.2d 111 (Fla. 4th DCA 1990); Albertson's, Inc. v. Adams, 473 So.2d 231 (Fla. 2d DCA 1985), rev. denied, 482 So.2d 347 (Fla. 1986).
HARRIS, C.J., and PETERSON, J., concur.
NOTES
[1] Fawaz v. Florida Polymers, 622 So.2d 492 (Fla. 1st DCA 1993); Grabner v. Florida Unemployment Appeals Commission, 604 So.2d 948 (Fla. 4th DCA 1992); Nelson v. Spiegel, 529 So.2d 311 (Fla. 4th DCA 1988); Times Publishing Co. v. Huffstetler, 409 So.2d 112 (Fla. 5th DCA), rev. denied, 417 So.2d 329 (Fla. 1982).
[2] § 627.311, Fla. Stat. (1985).
[3] See Warehouse Foods, Inc. v. Corporate Risk Management Services, Inc., 530 So.2d 422 (Fla. 1st DCA 1988); Bennett v. Berk, 400 So.2d 484 (Fla. 3d DCA 1981); deMarlor v. Foley Carter Insurance Co., 386 So.2d 22 (Fla. 2d DCA 1980); Carrier Agency, Inc. v. Top Quality Building Products, Inc., 519 N.E.2d 739 (Ind. Ct. App. 1988); 43 Am.Jr.2d, Insurance § 138, 139, 142 (1982) Thomas R. Trenkner, Annotation, Broker's Failure to Procure Insurance, 64 A.L.R.3d 398, § 3 (1975).
[4] See, Bergdorf v. Allstate Insurance Co., 541 So.2d 716 (Fla. 4th DCA). rev. denied, 551 So.2d 460 (Fla. 1989); T.D.S., Inc. v. Shelby Mutual Insurance Co., 760 F.2d 1520 (11th Cir.1985); 16A Appleman, Insurance Law and Practice § 8878.35 (1981).
[5] Carrier Agency Inc. v. Top Quality Building Products, Inc., 519 N.E.2d 739 (Ind. Ct. App. 1988).
[6] Trenker, supra; 16A Appleman, supra.
[7] 16A Appleman, supra; See Twyman v. Roell, 123 Fla. 2, 166 So. 215 (1936); T.D.S., Inc. v. Shelby Mutual Insurance Co., 760 F.2d 1520 (11th Cir.1985); Joseph Forest Products, Inc. v. Pratt, 278 Or. 477, 564 P.2d 1027 (1977).
[8] See Joseph Forest Products, Inc. v. Pratt; Douglass Fertilizers & Chemical, Inc. v. McClung Landscaping, Inc., 459 So.2d 335 (Fla. 5th DCA 1984); Aetna Casualty & Surety Co. v. Day, 487 So.2d 830 (Miss. 1986); 17 Fla.Jur.2d Damages § 79 (1980).
[9] These basic charges for 1985 and 1986 were later reduced in total amount but were not disputed by Mill Creek.
[10] 17 Fla.Jur.2d Damages § 80 (1980); Douglass Fertilizers & Chemical, Inc. v. McClung Landscaping, Inc.
[11] Born v. Goldstein, 450 So.2d 262 (Fla. 5th DCA), rev. denied, 458 So.2d 272 (1984); Sampley Enterprises, Inc. v. Laurilla, 404 So.2d 841 (Fla. 5th DCA 1981); Electro Services, Inc. v. Exide Corp., 847 F.2d 1524 (11th Cir.1988) T.D.S., Inc. v. Shelby Mutual Insurance Co., 760 F.2d 1520 (11th Cir.1985). But see Wharfside Two Limited v. W.W. Gay Mechanical Contractor Inc., 523 So.2d 193 (Fla. 1st DCA 1988), approved, 545 So.2d 1348 (Fla. 1989).
[12] See Robert A. Huggins General Contractor, Inc. v. Willoughby, 595 So.2d 1003 (Fla. 5th DCA), rev. denied, 602 So.2d 943 (Fla. 1992); American Motorcycle Institute, Inc. v. Mitchell, 380 So.2d 452 (Fla. 5th DCA 1980), overruled on other grounds, Ault v. Lohr, 538 So.2d 454 (Fla. 1989); Don Burton, Inc. v. Aetna Life & Casualty Co., 575 F.2d 702 (9th Cir.1978).
[13] See Sampley Enterprises, Inc. v. Laurilla; Wharfside Two, Ltd. v. W.W. Gay Mechanical Contractor, Inc.; Twyman v. Roell, 123 Fla. 2, 166 So. 215 (1936); Electro Services, Inc. v. Exide Corp.
[14] See Born v. Goldstein, 450 So.2d 262 (Fla. 5th DCA), rev. denied, 458 So.2d 272 (Fla. 1984).
[15] 2 Am.Jur.2d Damages § 1028 (1988).
[16] Compare Pahokee Housing Authority, Inc. v. South Florida Sanitation Co., 478 So.2d 1107 (Fla. 4th DCA 1985), rev. denied, 491 So.2d 280 (Fla. 1986); Belly Acres, Inc. v. Frankel, 412 So.2d 48 (Fla. 5th DCA 1982). See Webb Automotive Distributors, Inc. v. Baxter, 574 So.2d 1139 (Fla. 4th DCA), rev. denied, 583 So.2d 1034 (Fla. 1991).
[17] 3 Fla.Jur.2d Appellate Review § 352 (1978); Food Fair Stores, Inc. v. Morgan, 338 So.2d 89 (Fla. 2d DCA 1976).
[18] See T.D.S., Inc. v. Shelby Mutual Insurance Co.