**ESSEX BUILDERS GROUP, INC., Plaintiff,**

v.

**AMERISURE INSURANCE COMPANY and Pennsylvania General Insurance Company,[1] Defendants.**

**No. 6:04–cv–1838–Orl–22JGG.**

United States District Court, M.D. Florida, Orlando Division.

Dec. 13, 2006.

Order Denying Clarification or Reconsideration Jan. 22, 2007.

1. Pennsylvania General Insurance Company was formerly known in this case as OneBeacon Insurance Company. On July 17, 2006, OneBeacon filed an Unopposed Motion to Amend Name of Party, which sought to "correct a misnomer as to the name of the insurer of the policy of insurance issued to Essex." Doc. 291 at 2. More specifically, OneBeacon sought to "amend its name to Pennsylvania General Insurance Company." *Id.* at 1. By Order dated August 4, 2006, the Court granted the motion. Doc. 304. In that Order, the Court expressly stated: "Henceforth, OneBeacon Insurance Company shall be referred to in this lawsuit as Pennsylvania General Insurance Company." *Id.* at 2.

Brenton Neil Ver Ploeg, Stephen A. Marino, Jr., Ver Ploeg & Lumpkin, P.A., Miami, FL, Robert Patrick Major, Winderweedle, Haines, Ward & Woodman, P.A., Orlando, FL, for Plaintiff.

John Bond Atkinson, Rebecca Ann Brownell, Atkinson & Brownell, P.A., Miami, FL, Jeffrey Russell Davis, Stuart J. Freeman, Brasfield, Fuller, Freeman, & O'Hern, PA, St. Petersburg, FL, for Defendants.

## ORDER

CONWAY, District Judge.

## I. INTRODUCTION

This cause comes before the Court for consideration of pending motions in this insurance coverage dispute. After carefully considering these motions and associated filings, the Court issues the rulings set forth herein.

## II. BACKGROUND

In March 1999, Plaintiff Essex Builders Group, Inc. ("Essex") entered into an agreement to act as general contractor on an apartment construction project. Reliance Insurance Company, the predecessor to Travelers Casualty & Surety Company ("Travelers"), issued a performance bond on behalf of Essex. Following project completion, the owner discovered water damage to the apartment buildings. After incurring substantial costs to remedy the problem, the owner demanded reimbursement from Essex. The owner also made a claim against the bond. Essex's commercial general liability ("CGL") insurers, Defendants Pennsylvania General Insurance Company ("PGIC") and Amerisure Insurance Company ("Amerisure"), received notice of the claim against Essex, but did not pay it. Ultimately, Travelers paid the project owner $6.25 million to resolve the owner's claim.

In the present lawsuit, Essex sues PGIC and Amerisure for breach of the CGL insurance contracts. Essex maintains that Travelers' bond payment to the project owner rendered Essex unbondable and thereby "severely impaired and/or destroyed" its business. Joint Final Pretrial Statement ("PTS") (Doc. 336) at 3–4. Essex seeks "consequential damages for the injury to its business, as well as the damages, costs and attorney's fees associated with defending against the Claim and ... bringing this action." *Id.* at 4.

## III. SUMMARY JUDGMENT STANDARD

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "The party seeking summary judgment bears the initial burden of identifying for the district court those portions of the record 'which it believes demonstrate the absence of a genuine issue of material fact.' " *Cohen v. United Am. Bank of Cent. Fla.*, 83 F.3d 1347, 1349 (11th Cir.1996) (quoting *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1396, *modified on other grounds*, 30 F.3d 1347 (11th Cir.1994)). "There is no genuine issue for trial unless the non-moving party establishes, through the record presented to the court, that it is able to prove evidence sufficient for a jury to return a verdict in its favor." *Cohen*, 83 F.3d at 1349. The Court considers the evidence and all inferences drawn therefrom in the light most favorable to the non-moving party. *See Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 918 (11th Cir.1993).

## IV. PGIC'S MOTION FOR PARTIAL SUMMARY JUDGMENT[2]

■ At the outset, PGIC denies that Essex can prove it was forced out of business as a result of the CGL insurers' failure to pay the project owner's claim. PGIC further maintains that even if Essex can prove this injury, "it is not entitled, as a matter of law, in its Breach of Contract claim, to recover the consequential damages it is seeking as a result of its being forced to go out of business." Doc. 298 at 2.[3] To support this argument, PGIC relies on two cases: *Swamy v. Caduceus Self Ins. Fund, Inc.*, 648 So.2d 758 (Fla. 1st DCA 1994), and *Frenz Enters., Inc. v. Port Everglades*, 746 So.2d 498 (Fla. 4th DCA 1999).

In *Swamy*, a liability insurer failed to settle a medical malpractice claim against a physician, resulting in a judgment that greatly exceeded policy limits. This prompted Dr. Swamy to sue his insurer for bad faith. In that suit, the doctor "sought damages to compensate [him] for the excess judgment, a loss of profits due to reduced referrals, and damage to professional reputation." 648 So.2d at 759. Thereafter, the insurer paid the tort plaintiff the $1 million policy limit, and later agreed to pay her "an additional $2 million in return for a satisfaction of the judgment and [the tort plaintiff's] unconditional release of Dr. Swamy and [the insurer]." *Id.* The insurer then "moved for summary judgment in Dr. Swamy's suit, arguing that its satisfaction of the excess judgment precluded further recovery by Dr. Swamy and, in essence, extinguished Swamy's cause of action for bad faith." *Id.* The

lower court agreed and granted summary judgment in the insurer's favor.

On appeal, Florida's First District first determined that an insured tortfeasor's damages are not necessarily limited to the amount of an excess judgment; and that "additional damages may be recovered." *Id.* at 759–760. The appellate court then confronted the question "whether the damages actually pled by Dr. Swamy were recoverable in his action for bad faith at common law or pursuant to section 624.155, Florida Statutes." *Id.* at 760 (footnote omitted).

The First DCA noted that in Florida, an insured's bad faith claim against its insurer for failure to settle a third party's claim sounds in contract, rather than in tort. *Id.* Consequently, the recoverable damages "are limited to those that can be said to have been contemplated by the parties at the time of the formation of the insurance contract." *Id.* Applying this legal principle to the facts in *Swamy*, the appellate court stated:

> In the instant case, once the excess judgment was satisfied, Dr. Swamy's remaining damage claims consisted of alleged lost profits due to reduced referrals, and damage to his professional reputation. In essence, Dr. Swamy sought to recover for losses resulting from the attendant negative publicity of the large excess judgment. Such damages are, at best, an indirect consequence of Caduceus' failure to settle. More importantly, the loss of reputation and referral cannot be said to have been within the contemplation of the parties to the insurance contract.

---

2. This motion was filed in OneBeacon's name, before the Court granted OneBeacon's motion to change its name to PGIC for the purposes of this lawsuit. Amerisure has joined in PGIC's motion for summary judgment. Doc. 300.

3. The Court will assume, purely for present analytical purposes, that PGIC and Amerisure breached the CGL insurance contracts, that the breach rendered Essex unbondable, and that this forced Essex out of business.

Presumably, Dr. Swamy procured insurance to protect himself from the serious risks involved in practicing medicine. Insured and insurer must have contemplated that the insurer's bad faith in failing to settle a claim could jeopardize the insured's security by exposing him to an excess judgment. In such an event, the carrier could be liable for the amount of the excess judgment or damages resulting from execution. The possibility that negative publicity would be generated, which would then result in a loss of reputation and business, cannot be deemed the natural or contemplated result of the carrier's breach. In short, the damages claimed by Dr. Swamy were not recoverable in Florida, and the trial court properly entered summary judgment for [the insurer].

*Id.* at 760–761 (alteration added).

In *Frenz Enterprises*, the plaintiff ("Frenz") appealed a final judgment awarding it damages on its breach of contract claim against Port Everglades and Broward County for dredging work. Among other things, Frenz argued that the trial court committed error when it denied Frenz's proposed jury instructions regarding lost profits. On that point, Florida's Fourth District stated:

The trial court ruled Frenz's claim seeking lost profits based on an alleged inability to obtain a bond as a result of its dealings with the Port was inappropriate because such damages were not foreseeable. We agree. To recover damages for lost profits in a breach of contract action, a party must prove a breach of contract, that the party actually sustained a loss as a proximate result of that breach, that the loss was or should have been within the reasonable contemplation of the parties, and that the loss alleged was not remote, contingent, or conjectural and the damages were reasonably certain. *See Crain Automotive Group[, Inc.] v. J & M Graphics [Inc.],*

427 So.2d 300, 301 (Fla. 3d DCA 1983) (reciting the elements of a claim for damages for lost profits as a result of the late placement of an advertisement).

Here, the evidence did not establish that Frenz's drop in revenues from $6,000,000 to zero was proximately caused by the Port's failure to pay Frenz the amount it expected under the contract and the Port's filing of a counterclaim seeking liquidated damages. Frenz failed to establish that such a large loss was or should have been within the reasonable contemplation of the parties, or that the Port should have known Frenz would lose his bond line. To the contrary, it would have been reasonable to expect Frenz's business to continue to some extent. Frenz has failed to establish an abuse of discretion under this point.

746 So.2d at 504 (alterations added).

PGIC essentially argues that *Swamy* and *Frenz Enterprises* establish that the types of damages Essex seeks here are not recoverable as a matter of law, on the ground that they cannot be considered to have been within the contemplation of the parties at the time of contract formation, *i.e.*, the date on which the CGL policies were issued. However, PGIC places undue importance on these decisions. They do stand for the proposition that contract damages are limited to those within the contemplation of the parties at the time of contract formation, and, also, that a litigant who fails to establish such a connection cannot recover consequential damages. However, these cases do not suggest that the types of consequential damages Essex seeks here can *never* be recovered. In fact, there is Florida decisional authority suggesting that in appropriate circumstances, an insured may recover consequential damages when its insurer's breach of contract

causes the insured's business to fail. *See Travelers Ins. Co. v. Wells,* 633 So.2d 457 (Fla. 5th DCA 1993). At bottom, *Swamy* and *Frenz Enterprises* are largely failure-of-proof cases. They do little to resolve the question presented here, *i.e.,* whether the plaintiff *in this case* has proved that the damages claimed *here* are legally compensable.

Hence, the salient question is whether Essex has identified evidence, sufficient to present a jury question, that the alleged destruction of Essex's business as a result of the CGL insurers' refusal to pay the project owner's claim was a consequence within the contemplation of the parties at the time the insurance policies were issued. In an effort to thwart entry of summary judgment, Essex asserts that it was "commonly known that a bond payment would be fatal to Essex." Doc. 331 at 6 (capitalization omitted).[4] To support this contention, Essex quotes the testimony of a representative (Marcelle Houston) of Essex's bond surety (Travelers), who stated that no principal wants its surety to pay a bond claim because that guarantees the principal will never again be able to obtain bonding. Essex also relies on the testimony of one of Essex's owners (Ed Storey), the company's bonding agent (Dave Carr), and a representative (Tom Finn) of another entity that issued corporate surety bonds (Zurich American Insurance Company). Collectively, this testimony supports Essex's position that after Travelers paid the bond claim, Essex became unbondable, was therefore precluded from working on any projects requiring a bond, and ceased doing business as a result. Essex maintains this evidence establishes that "[i]t was . . . no secret that if Defendants failed to defend and indemnify

Essex, it would lose the ability to secure additional bonds." *Id.* at 7.

This evidence may show that these consequences were no secret to Essex, the company's bonding agent, Travelers, or others in the surety bond business, but it is insufficient to prove that they were within the actual or constructive knowledge of PGIC and Amerisure. In that regard, Essex has presented no evidence that PGIC or Amerisure knew or should have known at the time of contracting that the natural consequence of denying coverage to Essex for an owner's claim arising from a construction project would be that Essex would lose its ability to obtain bonding, and that the company would be severely damaged or forced out of business as a result. Essex's position really boils down to this: what was common knowledge to those associated with corporate surety bonding necessarily was universally understood among those writing CGL policies. This is *too great a leap of faith* to withstand intellectual scrutiny. Supposition is not the same as reasonable inference, and speculation cannot substitute for evidence. Additionally, Essex has not shown what percentage of its work required bonds, or that its CGL insurers were familiar enough with Essex's business operations that they knew or should have known that the bonded portion of Essex's work was significant enough that the loss of that business would severely damage Essex or lead to the company's demise.

In sum, then, Essex has presented no evidence that PGIC or Amerisure ever contemplated at the time of contracting that a denial of a third-party claim against the CGL policies would result in Essex losing bonding capacity and failing as a business. Similarly, Essex has failed to

---

**4.** The quoted passage is lifted from the title to section IV of Essex's opposition memoran-   dum.

present any evidence that it was universally understood in the CGL insurance industry that a refusal to pay an underlying claim such as this would necessarily result in a loss of a building contractor's bonding eligibility, and, proceeding yet another step, that a loss of bonding capacity would necessarily (or even likely) lead to severe damage to or destruction of an insured construction business.

Perhaps Essex might have established these things through depositions of PGIC's and Amerisure's representatives, or through an expert witness; perhaps not. It could be that these matters are indeed common knowledge throughout the insurance industry, and CGL insurers invariably know what corporate bond sureties know. However, the fact remains that Essex has presented no actual evidence of this. Consequently, in the final analysis, this is a failure of proof akin to that in *Swamy* and *Frenz Enterprises*.[5] Accordingly, PGIC (and, by adoption, Amerisure) is due summary judgment on Essex's claimed damages associated with the de-

mise of, or severe injury to, Essex's construction business.[6]

## V. ESSEX'S MOTION FOR SUMMARY JUDGMENT

### A. Essex's Positions

■ The PGIC policy provided coverage for the period November 11, 1999 through November 11, 2000. PTS, § 9, ¶ G, at 6. The Amerisure policy afforded coverage for the following one-year term, from November 11, 2000 through November 11, 2001. *Id.*, ¶ H, at 6.[7] Essex seeks summary judgment against both Amerisure and PGIC on the asserted basis that the project owner's claim "falls within the [CGL] policies' covering agreement, and no exclusions or policy conditions apply to bar coverage." Doc. 301 at 1. More specifically, Essex maintains that the water damage to the apartments constitutes "property damage" and an "occurrence" under the CGL policies. Essex then states:

> The undisputed facts show that the damage to the Construction Project first be-

---

5. In its summary judgment response, Essex cites cases suggesting that a party may demonstrate entitlement to consequential contract damages by showing *either* that they were within the reasonable contemplation of the parties *or* "ar[o]se naturally from the breach." Doc. 331 at 12 (quoting *T.D.S., Inc. v. Shelby Mut. Ins. Co.*, 760 F.2d 1520, 1531 n. 11 (11th Cir.1985)). As a matter of law, Essex's claimed consequential damages are equally unavailable under the "arising naturally" standard. Based largely on the factors this Court has already discussed, these damages are too attenuated to be characterized as naturally flowing from PGIC's and Amerisure's alleged contract breach.

6. This ruling is not inconsistent with the Court's September 3, 2006 Order denying the Defendants' prior motion for partial summary judgment. *See* Doc. 327. There, the issue was proximate cause. Here, the issue is whether Essex has presented evidence that the resulting damages meet the legal standard

for recovery of consequential damages in a breach of contract action.

7. In its summary judgment motion, Essex states: "[T]he Amerisure policies incepted on November 11, 2000 and ran for two years (including a policy renewal), through November 11, 2002." Doc. 301 at 10. While it appears true that there are two one-year Amerisure policies (and even an umbrella policy), Essex's Complaint identified just one: policy number CPP1328103010000, which covered the period November 11, 2000 to November 11, 2001. *See* Doc. 1, ¶ 8, at 2 & Ex. "B." On June 28, 2006, Essex sought to supplement its pleadings to include the other CGL policy and the umbrella policy (and to add bad faith claims), but the Court denied Essex's motion. Consequently, the Court will not consider the second CGL policy for summary judgment purposes. However, that policy and the umbrella policy may still be admissible at trial to rebut Amerisure's impossibility defense. *See* § VI, *infra*.

came visible in late 2001. The damage itself, however, began within a short period of time after each building within the project was completed, then continued over time until it was observed. The undisputed facts also show that the buildings within the project were turned over to the Project Owner between March and December of 2000. The [PGIC] policy period ran from November 11, 1999 through November 11, 2001 [sic]; the Amerisure policies incepted on November 11, 2000 and ran for two years (including a policy renewal), through November 11, 2002. The Claim, and the damage incorporated therein, clearly falls within the policy periods of both Amerisure and [PGIC].

Doc. 301 at 10 (footnotes omitted).[8]

## B. PGIC's Response

For present purposes, PGIC does not dispute that the damage to the apartment buildings first manifested itself in late 2001, and that the buildings were turned over to the owner between March and December of 2000. Doc. 317 at 3–4. However, PGIC does challenge Essex's position that the property damage occurred within the PGIC policy period, *i.e.,* from November 11, 1999 to November 11, 2000.

On that point, PGIC contends that when damage continuously occurs, the "trigger" for CGL coverage is the point at which the damage manifests itself or is discovered. To support this contention, PGIC cites *Auto Owners Ins. Co. v. Travelers Cas. & Surety Co.,* 227 F.Supp.2d 1248 (M.D.Fla.2002). In that case, Magistrate Judge Jenkins of this Court construed policy language virtually identical to that present in the instant case, surveyed the four generally accepted "trigger of coverage" theories,[9] and stated that "Florida courts follow the general rule that the time of occurrence within the meaning of an 'occurrence' policy is the time at which the injury first manifests itself." 227 F.Supp.2d at 1266 (citing, *inter alia, Travelers Ins. Co. v. C.J. Gayfer's & Co.,* 366 So.2d 1199 (Fla. 1 st DCA 1979)[10]).[11] PGIC reasons that because Essex's position is that the damage or injury to the apartment buildings did not manifest itself until late 2001, there was no occurrence before the PGIC policy's coverage ended in November 2000. On this asserted basis, says PGIC, Essex's summary judgment motion must be denied.

The undersigned judge agrees with Judge Jenkins' reasoning in *Auto Owners* regarding the "trigger of coverage" issue.[12]

**8.** Essex presents additional arguments regarding the inapplicability of certain policy exclusions. However, the Court need not address those arguments given its determinations regarding the question of whether there has been an "occurrence" within the CGL policy periods. *See* § V.B & C, *infra.*

**9.** The four theories are (1) exposure, (2) manifestation, (3) continuous trigger, and (4) injury in fact. 227 F.Supp.2d at 1266.

**10.** *C.J. Gayfer's* states: "The term 'occurrence' is commonly understood to mean the event in which negligence manifests itself in property damage or bodily injury[.]" 366 So.2d at 1202.

**11.** District Judge Merryday adopted Judge Jenkins' report and recommendation. 227 F.Supp.2d at 1253.

**12.** Respectfully, however, the undersigned judge disagrees with that part of *Auto Owners* that discusses *LaMarche v. Shelby Mut. Ins. Co.,* 390 So.2d 325 (Fla.1980), for the reasons expressed in the September 21, 2005 Order (Doc. 133) entered in the instant case. The Court continues to adhere to its prior rulings regarding *LaMarche, State Farm Fire & Cas. Co. v. CTC Dev. Corp.,* 720 So.2d 1072 (Fla. 1998), and *J.S. U.B., Inc. v. U.S. Fire Ins. Co.,* 906 So.2d 303 (Fla. 2d DCA 2005), and the impact of those decisions on the coverage afforded by CGL policies. Accordingly, the Court declines the Defendants' invitations to revisit those issues.

Because Essex's position is that the damage to the apartment buildings was not visible until late 2001, and the PGIC policy expired in November 2000, there was no occurrence within the policy period. Accordingly, Essex's summary judgment motion regarding coverage is due to be denied as to PGIC.[13] Alternatively, based on the deposition testimony cited in PGIC's response to Essex's motion, even if the injury-in-fact trigger theory applies, there are still unresolved issues of fact concerning whether the property damage occurred during the term of the PGIC policy. On that additional basis, Essex's summary judgment motion must be denied as to PGIC.

### C. Amerisure's Response

Amerisure points out that from January 2004 to February 2006, Essex was being defended from claims arising from the apartment construction project by another insurer, Liberty Mutual, due to Essex's status as an additional insured under one of its' subcontractors' policies. Building on that point, Amerisure relies on provisions in its policy regarding "excess" insurance and argues that Amerisure's duty to defend was not triggered until Liberty Mutual withdrew its defense of Essex. The Court does not find this argument dispositive of Essex's summary judgment motion. While these circumstances may impact Amerisure's liability for alleged failure to defend, Amerisure has not demonstrated how it would extinguish the insurer's separate duty to indemnify Essex.

Amerisure advances a second argument in response to Essex's summary judgment motion. Like PGIC, Amerisure argues that material issues of fact exist concerning when the damage to the apartment

buildings actually occurred and, more to the point, whether that damage occurred within the policy period. As previously noted, Amerisure's CGL policy ran from November 11, 2000 to November 11, 2001. Amerisure takes the position that "the property damage first occurred at various times throughout each building's construction, i.e., between March 1999 and December 2000." Doc. 320 at 12 (emphasis omitted). Most of this period pre-dated the commencement date of the Amerisure policy. Consequently, Amerisure asserts that Essex has not demonstrated conclusively that property damage occurred during the CGL policy period, and fact issues remain which must be resolved at trial.

Unlike PGIC, Amerisure has not expressly addressed the "trigger of coverage" issue. Rather, the insurer seemingly assumes that the injury-in-fact trigger theory applies. However, the Court reiterates that under Florida law, the general rule is that "the time of occurrence within the meaning of an 'occurrence' policy is the time at which the injury first manifests itself." *Auto Owners*, 227 F.Supp.2d at 1266. Here, according to Essex, at least, the damage "first became visible in late 2001." Doc. 301 at 10. "Late 2001" could mean sometime after November 11, 2001, the last date Amerisure's CGL policy was in force. Moreover, Essex has not specified whether the "visible" damage in "late 2001" manifested itself in just one building, or more than one structure. Based on these considerations, the Court determines that under the manifestation trigger theory of coverage, Essex has failed to demonstrate as a matter of law that an "occurrence" took place within the Amerisure policy period. Alternatively, if the injury-

---

13. If PGIC had moved for summary judgment on this point, the Court likely would have granted such a motion based on the same reasoning. However, PGIC did not move for summary judgment, and the Court does not believe it can fairly grant summary judgment *sua sponte* in PGIC's favor without affording Essex an opportunity to be fully heard on the issue.

in-fact trigger theory applies, as Amerisure points out, there are still unresolved issues of fact concerning whether the property damage occurred during the term of the Amerisure policy. Either way, Essex has not demonstrated its entitlement to summary judgment against Amerisure.

### D. The "Confession to Judgment" Issue

■ In a footnote to its summary judgment motion, Essex raises a point it previously argued in connection with its motion seeking leave to file a supplemental complaint adding bad faith claims. In that regard, Essex contends that all of the issues it addresses in its summary judgment motion have already "been resolved in favor of Essex by Defendants' assumption of their duty to defend Essex and payment of the Claim to Travelers." Doc. 301 at 1 n. 1. In other words, Essex contends the Defendants' have essentially confessed to judgment in the sense of admitting liability on Essex's breach of contract claims, which seek millions of dollars in consequential damages arising from the alleged destruction of Essex's business. To support this position, Essex principally relies on decisions addressing confession of judgment in the context of determining prevailing party status under Fla. Stat. § 627.428, an attorney's fee provision contained in Florida's insurance code. However, the Court does not find the cases addressing confession of judgment in that context to be analogous to the very different circumstances of the case at bar. It is one thing to subject a settling insurer to liability for attorney's fees under a fee-shifting statute, and quite another to expose the insurer to potential liability for consequential damages. The consequential damages Essex seeks are wholly distinct from the sums the Defendants are contractually obligated to pay under the CGL policies (assuming coverage and liability on the part of the insured). Additionally, based on the May 2, 2006 tender letter from Essex's counsel,

Robert Major, to Defendants' attorneys, Ex. "E" to Doc. 292, there appears to be a fact question concerning whether the Defendants' eventual assumption of Essex's defense was undertaken under a reservation of rights. In the end, the Court is not convinced that, as a matter of law, the Defendants exposed themselves to potential liability to Essex for consequential damages merely by assuming Essex's defense and settling with Travelers.

### VI. AMERISURE'S MOTION IN LIMINE

■ Amerisure seeks an order precluding Essex from offering evidence relating to a second CGL policy Amerisure issued Essex, covering the period November 11, 2001 to November 11, 2002, as well as an umbrella policy covering Essex. Based on Essex's response to the motion, the Court concludes that these insurance policies may be admissible to rebut Amerisure's impossibility defense. Accordingly, Amerisure's motion will be denied insofar as it seeks a pretrial exclusionary ruling. A final determination concerning admissibility will be made at trial.

### VII. CONCLUSION

Based on the foregoing, it is ORDERED as follows:

1. Defendant Pennsylvania General Insurance Company's Motion for Partial Summary Judgment as to Essex Builder's Group, Inc.'s Consequential Damage Claim (Doc. 298), filed July 31, 2006, is GRANTED. Summary judgment is awarded in favor of PGIC and its codefendant, Amerisure Insurance Company, on Plaintiff's claim for consequential damages arising from the alleged destruction of Plaintiff's business. This ruling will be incorporated in a final judgment entered at the conclusion of the entire case.

2. Plaintiff Essex Builder's Group, Inc.'s Motion for Summary Judgment

(Doc. 301), filed August 1, 2006, is DE-NIED.

3. Defendant Amerisure Insurance Company's Motion In Limine (Doc. 326), filed September 1, 2006, is DENIED insofar as it seeks a pretrial exclusionary ruling concerning the admissibility of the two insurance policies that are the subject of the motion.

4. On or before December 18, 2006, counsel for the parties shall confer and shall submit a written filing (a) identifying the issues remaining for trial and (b) estimating how long the case will take to try. The Court prefers a joint submission. Failing agreement, the parties may file separate memoranda.

**DONE and ORDERED.**

### ORDER ON MOTION

This cause comes before the Court for consideration of Plaintiff Essex Builders Group, Inc.'s Motion for Clarification or, in the Alternative, Reconsideration of the December 13, 2006 Order (Doc. 354), filed on December 22, 2006, and Defendant Amerisure Insurance Company's Opposition (Doc. 361) to that motion.[1]

By means of this Motion, Essex seeks clarification of the Court's December 13, 2006 Order (Doc. 348) in the following respects:

... to specify that: (1) Amerisure's and PGIC's settlement of the Travelers claim operates as a confession of judgment with respect to the claim for contractual damages caused by Defendants' failure to defend and indemnify Essex against the Claim; (2) Essex is entitled to attorney's fees and costs under Fla. Stat. § 627.428 as the prevailing party with regard to Defendants' contractual duties to defend and indemnify Essex;

and (3) Essex is not barred from seeking consequential damages in a bad faith action under the standard provided by Fla. Stat. § 624.155. In the alternative, Essex respectfully requests that this Court reconsider its holding regarding whether Essex presented sufficient evidence regarding its entitlement to consequential damages under the common law standard for contractual damages.

Doc. 354 at 2.

In its December 13th Order, the Court ruled that Amerisure and PGIC's settlement with Travelers did not constitute a confession of judgment on Essex's claims against Amerisure and PGIC in this suit. The Court's principal concern at that time was that it would be legally improper to subject the CGL insurers to liability for consequential damages under a confession of judgment theory. In that regard, the Court stated:

Essex contends the Defendants have essentially confessed to judgment in the sense of admitting liability on Essex's breach of contract claims, which seek millions of dollars in consequential damages arising from the alleged destruction of Essex's business. To support this position, Essex principally relies on decisions addressing confession of judgment in the context of determining prevailing party status under Fla. Stat. § 627.428, an attorney's fee provision contained in Florida's insurance code. However, the Court does not find the cases addressing confession of judgment in that context to be analogous to the very different circumstances of the case at bar. It is one thing to subject a settling insurer to liability for attorney's fees under a fee-shifting statute, and quite another to expose the insurer to potential liability for consequential

---

1. Essex and Amerisure's co-defendant, Pennsylvania General Insurance Company ("PGIC") have reached a settlement.

damages. The consequential damages Essex seeks are wholly distinct from the sums the Defendants are contractually obligated to pay under the CGL policies (assuming coverage and liability on the part of the insured). Additionally, based on the May 2, 2006 tender letter from Essex's counsel, Robert Major, to Defendants' attorneys, Ex. "E" to Doc. 292, there appears to be a fact question concerning whether the Defendants' eventual assumption of Essex's defense was undertaken under a reservation of rights. In the end, the Court is not convinced that, as a matter of law, the Defendants exposed themselves to potential liability to Essex for consequential damages merely by assuming Essex's defense and settling with Travelers.

Doc. 348 at 14–15.

In the December 13th Order, the Court also ruled that Amerisure and PGIC were entitled to summary judgment on Essex's claimed consequential damages associated with the demise of, or severe injury to, Essex's construction business. *Id.* at 3–9. Now, Essex seeks a determination that Amerisure's settlement with Travelers constitutes a confession of judgment as to Amerisure's liability for the other contractual damages Essex seeks (apart from consequential damages) based on Amerisure's refusal to defend and indemnify Essex. To support this position, Essex cites *Wollard v. Lloyd's & Cos. of Lloyd's,* 439 So.2d 217, 218 (Fla.1983), in which the Florida Supreme Court stated: "When the insurance company has agreed to settle a disputed case, it has, in effect, declined to defend its position in the pending suit. Thus, the payment of the claim is, indeed, the functional equivalent of a confession of judgment or a verdict in favor of the insured."

In response, Amerisure concedes the holding in *Wollard.* Additionally, Amerisure does not argue that payment by it to Travelers would not constitute a confession of judgment under Florida law. In the Court's view, this effectively concedes the point that such payment would amount to a confession of judgment in this particular case. However, Amerisure asserts that Essex has failed to offer any proof that Amerisure actually paid money to Travelers as a part of the settlement. Amerisure points out that Essex attempted to reopen discovery for the purpose of obtaining a copy of the settlement papers in order to establish payment, but the assigned magistrate judge denied that motion on the ground that Essex had been dilatory. *See* Docs. 322 & 332. Continuing, Amerisure states:

> Consequently, the Record is devoid of any terms of the settlement agreement *including whether there was a payment of monies by Amerisure or PGIC to Travelers* and, as such, Plaintiff has not proved that Amerisure's settlement with Travelers constitutes a confession of judgment as to Plaintiff's contractual damages. Consequently, this Court should deny Plaintiff's Motion for Clarification of the Court's Order to specify that Amerisure's and PGIC's settlement with Travelers constitutes a confession of judgment.

Doc. 361 at 4 (emphasis in original).

Amerisure is correct in stating that, presently, there is no evidence in the record that Amerisure paid Travelers money to settle Travelers' claims against Essex. Accordingly, Essex has not, at least at this juncture, demonstrated that it is entitled to a favorable ruling on its confession of judgment theory. However, Essex has preserved this issue in the initial and amended pretrial statements. Docs. 336, § 12.A, at 9 ("Whether PGIC's and Amerisure's settlement with Travelers constitutes an admission of coverage for the Claim") & 364, § 12.A, at 10 (same). Ac-

cordingly, this is a fair subject of inquiry at trial. If Essex is able to establish through the trial witnesses that Amerisure paid money to Travelers as a part of the settlement,[2] the Court will consider what measures might be appropriate to remedy Amerisure's litigation gamesmanship on this point. In that regard, the Court will not be favorably impressed if jurors, witnesses, parties and attorneys are put to the trouble of appearing for a trial that is unnecessary.

Turning to the issue of whether Essex is entitled to attorney's fees and costs under Fla. Stat. § 627.428, the Court is presently unable to rule on this point because the confession of judgment issue remains outstanding and a judgment has not otherwise been entered against Amerisure.

Next, on the issue of whether Essex may seek consequential damages via a bad faith suit, Essex's motion for clarification essentially constitutes a request for an advisory opinion, which, of course, the Court cannot issue.

Finally, concerning Essex's alternative request for reconsideration of the Court's ruling that Essex cannot pursue its claim for consequential damages arising from destruction of Essex's business, Essex has not presented any valid basis for reconsideration.

Based on the foregoing, it is ORDERED that Plaintiff Essex Builders Group, Inc.'s Motion for Clarification or, in the Alternative, Reconsideration of the December 13, 2006 Order (Doc. 354), filed on December 22, 2006, is DENIED.

**DONE and ORDERED.**

---

2. The Court reserves ruling on whether this inquiry must be pursued outside the jury's presence.